to our first case, Gross v. GFI Group. Mr. Rotter. May it please the Court. Good morning. Jonathan Rotter for Plaintiff Appellant Benjamin Gross. The question in this summary judgment appeal is whether there were facts from which a reasonable jury could find in favor of the non-moving party. The answer is yes. Now, we agree with the district court's finding that there were tribal issues as to falsity and materiality. Unless the Court has questions about those elements, I would proceed directly to scienter. So I actually do. I look at the statement focused on in the press release in which Mr. Gooch touted a singular and, what's exactly the language, a unique opportunity. And I don't see much meaning in that. That strikes me as a generic statement of precisely the kind that recently in Singh we said was not actionable. It reflected a generic kind of endorsement of the proposed merger, but in the same time, the press release disclosed the insider transaction that would happen in this two-step arrangement. And I'm having difficulty seeing how, notwithstanding the reference to optimizing value for the shareholders generally, why that is an actionable statement. Could you explain? Certainly. And I'll address Singh first and then answer the question more generally. Okay. So in Singh, this Court noted that the statements at issue there were framed with cautionary language that spoke to the complexity and numerosity of the applicable regulations and pointed to the potential impossibility of compliance given the complexity and shifting nature of the government regulations. There was no cautionary language in this case that related to the deal. And under Alliance v. Hunt North American, cautionary language has to relate to the particular risk that the plaintiff claims to be misled by. Now, you would you What if you added, well, of course, we do not rule out the possibility of a subsequent takeover offer if that had been in the press release. Would that have changed it? No. Under Castellano, there's always a possibility of another offer. However, the question under Castellano is that the jury gets to consider is the slimness of that chance. And here, defendant's expert calculated that the market understood the information released on July 30th to indicate a 0 percent chance of a topping of a topping bid. Now, I think that's a little bit of an extreme position. Again, Castellano says that it's always possible. Now, as far as In fact, the merger agreement that came out the next day had a whole section on that. It had a fiduciary out. Most merger agreements do. And that didn't go to the question of correcting the misimpression left by the statement. Now, in Virginia bank shares, the Supreme Court held that a statement on a major transaction of this nature, a sale of the company, which is the most significant event in the life of a company, quoting this Court's decision in SEC v. Gian, found that a statement that even said that was as vague a term as high, that a price was high, was material and actionable in that context. Now, here, we can't just look at the statement, because under CIOLA, you have a duty to be accurate and complete when you speak. He clearly was speaking about the value of the deal. So we have to see under Rule 10b-5 what was omitted from that statement. Sotomayor, he did not say best. Well, he said Isn't that correct? He did not use the word best. He said that optimizing GFI's value for stockholders has been a goal of management since becoming public in 2005, and this transaction represents a singular and unique opportunity to return value. Now, optimizing A goal, right? Optimizing was a goal. He didn't say it was the only goal. Certainly he gave no indication that the major goal of this transaction was to deliver the brokers to him at a discount. And that's exactly what BGC said when they came and made their announcement on September 9th. They said, far from being an opportunity to return value to shareholders, the CME transaction deprives shareholders of the opportunity to realize appropriate value Aren't we supposed to infer that this is misleading based upon that? That's a subsequent statement. It seems to me that this is a little bit of hindsight here. No. Well, let's go back to what happened in February of 2013. Jeffrey's made a presentation to Gooch, saying that the way to the optimal strategy, the same optimized word used in the press release, the optimal strategy here to unlock the value of the brokerage and deliver value to shareholders is to merge with a synergistic competitor. Wait a second. Without going into the history, we're just looking. I'd like to focus, as you invited us to, on the meaning of the language that you focus on to the exclusion of other language, albeit in context here, and whether you can convince me that a reasonable shareholder would rely on a statement in the middle of a press release that disclosed subsequent insider transactions that a singular and unique opportunity is a guarantee of the best available price. Why is it reasonable to infer that from those generic and somewhat opaque words? It's not a matter of a guarantee, Your Honor. And we do have to look at the history, because the question is what was omitted from the statement. Under basic, material is — information is material if an omitted fact would change the total mix of information made available. Now, it was clearly material. To a reasonable reader, though, to somebody, to an objectively reasonable reader. And here, let me just add another element to this. This is a follow-on sentence, the sentence that you've selected out as actionable is a follow-on sentence. The preceding sentence says, we're very pleased to announce this transaction to CMA Group and the substantial premium and liquidity it delivers to our stockholders. Optimizing GFI's value — then it goes on — optimizing GFI's value for stockholders has been a goal of management since becoming a public company in 2005, and this transaction represents a singular and unique opportunity to return value. So he's pointed out that there's a premium over the current stock price, right? Yes. In the previous sentence. And then this is — this sentence that you've selected out is in that context. It further explains the significance of his prior statement. The press release also notes unanimous special committee approval without noting that Gooch killed the special committee's market check and deprived it of bargaining power. Any reasonable shareholder would want to know that Jeffries told Gooch that the IDB was worth $365 million. He was buying it for $165. But you focused still in your complaint and in your briefing on the sole statement made by Gooch. We've been very clear throughout, from the very beginning of this case, in our summary judgment briefing, in this — and in our briefing here, that the omissions are critical. And you can't evaluate whether the statement is misleading without looking at the omissions. And the omissions here about Gooch's manipulation of the process, his delivering the brokers to himself at a drastically and severely discounted price, in BGC's words, this was a business that he was buying for $165 million that had $231 million in cash. Can you shift over, then — I understand all that. Can you shift over to the question of Sienta here? Because it seems to me this is an odd way to perpetuate a scheme to defraud. There's one statement in the middle of a press release which explains — purports to explain a previous statement, and that somehow that connotes — leads one to conclude — reach a conclusion about Sienta without looking in hindsight again, just looking forward. There were no other bids on the table at the time, and there's always a possibility of a larger topic bid at some point. But I'm not sure how you get to — how you can begin to establish Sienta here either. Well, under Shields v. City Trust, we get there either through consciousness behavior, which we believe is established by the entire course of conduct leading to that statement, recklessness, or motive and opportunity. Now, it's a jury question — You're putting your hopes on the fact that this guy wanted to isolate out the brokerage business and buy it in a private — and take it private so that he could control it. But there's nothing that — you know, it's — it doesn't seem to me that this statement requires that — I don't see how this statement requires that kind of a corrective or an additional statement. Record page 933, GFI insisted, against CME's wishes, that this statement needed not to only be in the press release, but that it needed to be moved up because, quote, the transaction is transformative to GFI and because it's, quote, in all our interest to sell shareholders on the deal. That was an integral piece of Gooch's plan, to take the brokerage private at a discount. And again, the discount compared to the cash sitting on the books of the business — Why did the deal go through? And he had personal reasons for it. But — and this would help to further that. But the question is, you know, what was his — what was his fraud and who was he defrauding? The personal reasons were personal profit, taking $200 million of shareholder value away from the shareholders. Any reasonable shareholder would want to know that when the transaction is being announced. They don't learn that until, on September 9th, BGC makes its announcement. Do you think there's a breach of fiduciary duty of some kind going on here? There was in this case, and that was litigated separately in Delaware. Absolutely, the entire course of conduct from February, when Gooch — What happened in Delaware? In the Delaware case? Well, so when — despite having a blocking position here, Gooch was forced to do the deal with BGC that he did not want to do, is the short answer. Because that's the short answer. So — But do we expect to see enter? I mean, you're saying that the plan here was to sell shareholders on this deal and hope that they wouldn't wait around to read registration statements or wouldn't wait to see how this thing shook out? Absolutely. And I want to be clear that we believe that a jury could find Sienter under any one of the three avenues provided by Shields v. City Trust. You don't have to reach motive and opportunity. But yes, they believe that this was important to sell shareholders on the deal. Their experts said that the — Their same press release said, we're going to have a registration statement. This thing is not going to close for months, not until the next calendar year. And they urged shareholders to read the statement, right? They did. But they actually secretly hoped that they wouldn't. That's the theory. The reason that companies put out press releases is to communicate information. This record is replete with press releases on both sides. The companies felt that that was an important way to get information to shareholders. And the stock would continue to trade during the interim period. And under AUSA Life Insurance v. Ernst & Young, you know that if you make an announcement and you have a price that's below value, that scheme is necessarily going to injure those people who sell in between. So we believe that — yes, they believe that that would advance the project. Gooch felt that it was important to keep the price down in order to get shareholder approval, which he wanted. And the proxy did not, in the end, disclose important facts like the content of Jeffrey's February 2013 presentation, which explained to Gooch, which he knew, that the way to optimize the value of the company was to combine with a synergistic competitor. BGC on this acquisition is yielding $125 million annually in synergies. That was value that could have been returned to shareholders. Gooch blocked that plan. He said, I'm not interested in that. I want to buy it for myself personally. In June, he lied to the board about his consideration of that option. How do you arrive at that figure, the amount that was concealed, whatever it was, $175 million? So there — How do you arrive at that figure? That comes directly from Jeffrey's February 2013 presentation. That's a record page 840. You can also look at 835, which is their — What would the price have been for that? Is that the 541 price? We're now just focusing on the brokerage price, right? That's the part that Gooch was buying. Brokerage? It was a two-step transaction, $365 million for the brokerage. And recall, his price in the deal was $165 million. And again, as BGC points out, that was for a business with $231 million of cash. Any shareholder would want to know that. Any reasonable shareholder would want to know that the value in a synergistic combination is $365. As the bidding went up in this case, management raised its bid 70 percent without learning a single new fact about the company. And that was — and then they ran out of money. And BGC, the synergistic competitor, had the money because they could yield the synergies. Any reasonable shareholder would want to — Does that answer your question? I see we're keeping you well past your time. Well, thank you. You have two minutes for rebuttal. Is that —  Does that work? Actually, I did want to — Oh, go ahead. I want to ask you very briefly about the other ground that Judge Pauley did rely on, which was loss causation, right? So you haven't touched on that one yet. Thank you. And so what is the basis to say that you could — or that a jury could disaggregate the portion of the increase from the announcement versus the corrective disclosure? All that's required under Dura, following this Court's decision in emergent, is that you have a mispricing and then a loss event. And under Lentell v. Merrill Lynch, we look to see the relationship between the loss and that by which plaintiff claims to have been misled. The level of slicing that the district court required here is not supported by any of this Court's cases and, in fact, is contrary to the Court's decision in Wagoner, where you had a consequence. This was the attorney general's investigation and fines, which didn't exist at the time of the fraud, couldn't have been revealed because nobody knew that it would happen for sure. But because it was causally related, it did not have to be disaggregated from the rest of the drop. So we believe that under the appropriate standard, we have shown loss causation. A jury could still fine. Your theory, though, is that the statement in the press release caused the subsequent higher bid. Is that right? The entire course of conduct, the omitted conduct that we say was omitted from the statement — this is an omissions case just as much as a statements case and maybe more so — that that conduct caused that price to be where it was. Certainly Gooch wanted to close the deal at that price. Sotomayor, I thought that the ultimate buyer bought because the press release itself indicated and the value indicated what the nonbrokerage component would be, and that's what they were interested in. Yes. So the — So that was higher, and that's what basically triggered their bid. No. But what they said, what BGC said, was that the brokerage is being purchased at a discount. They called it a severely and drastically discounted price. They were the synergistic competitor that was able to treat the sale of — sale price for Trayport and Fennex as a fixed price, and then bid the actual value for the brokerage. Right? That was the whole scheme. Why don't we reserve the rest for your rebuttal, Laura, and we'll hear from Ms. Sullivan. Thank you, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan. I'll be arguing on behalf of all defendants. I'd like to begin where Judge Sullivan and Judge Walker left off with my friend on the other side and say why you should affirm Judge Pauly on the ground that no reasonable juror could possibly find loss causation here. And to see that, we have to remember what the alleged fraud is here. It's all about the single statement that Judge Carney focused on at the outset, the single statement that supposedly this deal, the CME deal, represented singular and unique value at the time, July 31st, 2014, it was announced. There is no causal connection between that statement, even if it's construed as false and material, and we strenuously argue that it is neither false nor material, and those are all true. But you lost that one at Judge Smith's, right? If we lost that one, even — we think you could affirm on the alternative ground that it wasn't false and it wasn't material for reasons we explained in our case, we suggest that you should affirm on the ground that there was no loss causation, and here's why. Their theory is that that statement about singular and unique value caused the loss to plaintiffs of the incremental amount, 525, that came from the BGC bid rather than the 452 at which they cashed out. Now, that cannot be the case. Why? Because as Judge Pauly observed on special appendix page 27, he lists all the subsequent actions that could not have been known or knowable at the time the press release comes out. And, Judge Walker, you hit the nail on the head on this. You couldn't have known at the time the press release comes out that there was later going to be a buyer who suddenly saw, based on the truth statement, true statement in the press release that the CMAE deal showed that the software components had value. That was new information. So as Judge Pauly summarizes it at special appendix page 27, the new information was BGC wanted to acquire in a hostile takeover at a cash premium amount because — and this is A-460, if you look at the appendix at A-460, you'll see Lutnick, the BGC buyer, asks, why did you buy? I didn't buy because I found out it was false, that that was the best bid. I bought because I found out it was true that there was more value in the software components of the business than I had known. So under Dura, you don't need to go farther than Dura, you know, the classic statement at 544 U.S. 343 of Dura that says new market conditions, new changes in investor expectations can break the causal connection. And here that's the case. It's the true statement in the press release that there's value, there's value enough to — and remember here, the price goes up 45 percent the day after the press release. It's a strange scheme that causes the price to go up if you're trying to keep the price down. So the loss causation theory here is economically implausible to begin with. But Judge Pauly was certainly correct, Your Honor, that the truth — it's the truthful information. The software business is worth a lot to CME, enough to drive the stock price up 45 percent. That's what drives the new topping offer that occurs later in the year. So the loss causation decision by Judge Pauly is absolutely correct under Dura, and it's sufficient grounds for you to affirm. Does the fact that Jeffrey's sort of pre-July press release, you know, told these guys that it was worth more, that it was — the breakup value was higher than the share price? No, that shouldn't have any effect. Look, the — if I could just go back to — we're on summary judgment, and they had 18 months and 55,000 documents to try to prove the case. And at the end of the day, their expert concedes — and the key colloquy in the deposition is at A-416-17 — their expert says, I have no opinion on whether the stock price would have gone up if you had removed the supposedly untrue statement, or Judge Walker, as you put it, what if he had said, well, there might be another bid? The expert offers no opinion on whether the stock price would have gone up at all as a result of that disclosure. There could be another topping bid. And he also admitted at 418-19 that he doesn't have an opinion that a correct press release, one that said, we think this is a unique and valuable opportunity, but there might be another deal. That's their theory of what the correct press release would have been. He then at 418-19, their expert, Mr. Kaufman, admits that he doesn't have an opinion on whether that correct press release would have caused the share price to hit $5.25. Now, this is not a case where they came in and they said, well, if you just said there might have been a topping bid, maybe you could have discounted the present value of that information to a few cents more on the deal. Their theory is 525 or nothing. Their theory is it wouldn't have been $4.52. It would have been $5.25. The expert never gave an opinion that, oh, we might have gotten $4.57 or 58 cents, and nobody would have brought a class action on that theory anyway. So, Your Honor, if the theory, and let's go back to the theory, it's that single statement, unique and valuable opportunity, the theory is that had it been additionally said in the press release, by the way, there might be a better offer, it would have gone up to 525, and their expert has admitted them out of that case on loss causation at pages 416 to 419 of the deposition. He also admitted that he was, at page A404, that there was never anything to prevent a topping bid. So that's on loss causation. If I could just go next to C, enter, the other ground on which Judge Poli held that summary judgment needed to be denied, we think that was also absolutely correct for the reasons Judge Sullivan and Judge Walker, you already explored, and colloquy with my friend on the other side. It is a very strange scheme, indeed, if you're trying to make sure that people think there's never going to be a topping bid. If you say in the press release, look at the proxy statement, deal isn't going to close for a long time, the next day you file your 8K with the merger agreement, it has a fiduciary out, there's three pages, pages A41 to A43, saying if there's a better offer, a superior proposal, you may take that, and then on the earnings call that takes place on August 1st, you say again, look to the proxy statement, be sure to wait for the proxy statement. You can't have C, enter, as Judge Poli correctly found, where there is that set of information simultaneously or contemporaneous with the press release. But is it your position, though, that a mere statement in a press release like this, look at the proxy statement, is enough to negate an absolutely false statement made with C, enter? No, Your Honor. Our position is you read, as a reasonable investor would, you read all the facts in context, you read the press release in context. We think a reasonable investor would read this the way the analysts, in fact, read it. If you looked at page A516 and page A524, you'll see one analyst, Alexander, saying we don't know if there was a competitive bid run, and asked what do we know about the process, and Mr. Heffron says look to the proxy statement. We think in context, a reasonable investor taking all of those statements into account, not just the press release, but all the contemporaneous statements taken into account would not read the statement to say, I guarantee you there'll never be a better bid. So we think you can affirm on the grounds Judge Pauly correctly decided the case on, lost causation and C, enter, for all the reasons we've discussed. But let me just close by saying two things. We think you could alternatively rule, for the reasons Judge Carney, you explored at the outset, that this case, summary judgment was also correct on the alternative ground that the statement simply wasn't an actionable false statement. But if that's true, you would have or should have won at a motion-to-dismiss stage and saved yourself all this time and energy. Your Honor, we couldn't agree more. So, but we are where we are, and we think that the summary judgment record amply confirms that there was no falsity on which a reasonable investor could have materially relied. But, Your Honor, I just want to say a quick word in closing about the cross-appeal. We also objected to the certification of the class with an inadequate representative based on the conflict of interest caused by the familial relationship between Mr. Gross and his attorneys. I want to be clear that you need not reach our cross-appeal, and we would be happy to voluntarily withdraw it, if you affirm the grant of summary judgment to defendants. We simply posed it as a conditional cross-appeal in the event you were to vacate and remand. We don't think this Court should be the first to bless an undisclosed conflict of interest between a lawyer and his counsel that would lead the counsel to potentially advance the interests of himself over the interests of the class. But do you think it merits a referral to the Grievance Committee? Does it go that far? We don't take a position on that, Your Honor. We just think that if you were to send this back, it would be very important not to make new law on the circuit blessing this kind of arrangement. In terms of your summary judgment arguments, so how would you rank them? Materiality, scienter, loss, causation? Thank you, Your Honor. We rank them number one, loss, causation, number two, materiality, number three, scienter, and number four, falsity. But we'd be happy with any order the Court decides to rule on. Thank you, Your Honor. Any one of them. Thank you very much. Mr. Rauter, you have two minutes. Thank you, Your Honor. I have four points to make, the first two about loss, causation, one about scienter, and the final one about the cross-appeal. In terms of Dura, what you need to separate out is things that affect the market as a whole, industry-wide, and firm-specific factors. There were no developments in the IDB that led to a higher price. It was only the revelation that it was worth much more, and Gooch knew that beforehand. On the question of our expert's opinion, he did not opine that the price would go to 525, and that's, in fact, not what happened when the competing bid was announced. The price went to over $6 because the market at that point understood that there was undervaluation and the comments that BGC made about that discount. Now, and he was also very specific, and this goes to the key issue in the case of the misstatement versus the omissions, he opined that it was the revelation of the omissions that would have caused the price to rise. Once the market learned that the brokerage would be worth so much more, $200 million more, to a synergistic competitor, that the market would demand that price. And that is the theory of Castellano following the Seventh Circus decision in Jordan. As to the proxy, this idea that the — that he necessarily would have made the proxy disclosures that he did had BGC not interrupted the scheme runs headlong into this Court's case law, Schlick v. Pendixie, which holds that even a rapacious controlling management cannot be assumed to want to air its dirty linen out on the line and thereby expose itself to suit or commission action. And Indiana Public Employees Retirement System v. SAIC, which says that we reject the argument that the benefits of a brief concealment would be low, the brief concealment here, because that confuses expected with realized benefits. Finally, the cross-appeal is reviewed for abuse of discretion. The Court did not abuse its discretion here against the background of this Court's case law and the Supreme Court's case law. And finally, if you are inclined to reverse on that ground, please do look at the record at page 276 to 281, the class certification hearing, where defendants agreed that they would stipulate to the class certification if another class representative was put forward. Thank you very much. Thank you for your arguments. Thank you all.